UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID THOMPSON,                              Case No. 09-14483

          Plaintiff,                        Paul D. Borman
                                    United States District Judge

vs.

                                    Michael Hluchaniuk
CORRECTIONAL MEDICAL                         United States Magistrate Judge
SERVICES, INCORPORATED, *et al.,*

          Defendants.
_____/

## REPORT AND RECOMMENDATION ON DEFENDANT CORRECTIONAL MEDICAL SERVICE'S MOTION FOR SUMMARY JUDGMENT [Dkt. 55]

## I.   Procedural History

Plaintiff David Thompson filed a complaint on November 17, 2009,

alleging that Defendants Correctional Medical Services, Inc. ("CMS") and Dr.

Darrelle Brady violated his civil rights under 42 U.S.C. § 1983.[1] (Dkt. 1).

According to plaintiff's complaint, defendants CMS and Dr. Brady deprived him

of his constitutional rights by failing to obtain an orthopedic consultation and an

MRI after he injured the biceps muscle and tendon in his left arm.  This case was

referred to the undersigned for all pretrial purposes on November 24, 2009.  (Dkt.

---

[1] Plaintiff also brought this action against Dr. Keith Ivens, but plaintiff's complaint against Dr. Ivens was dismissed without prejudice on March 12, 2012, for lack of service pursuant to Fed. R. Civ. P. 4(m) and Local Rule 41.2.  (Dkt. 53).

7).  On March 26, 2012, defendants CMS and Dr. Brady filed a motion for summary judgment.  (Dkt. 55).  Plaintiff filed a response on May 1, 2012.  (Dkt. 57).

On January 24, 2013, this court granted in part and denied in part defendants' motion for summary judgment.  (Dkt. 61).  Specifically, the court concluded that there existed no genuine issue of material fact indicating that defendant, Dr. Brady, was deliberately indifferent to plaintiff's medical needs.  (*Id*. at 26-27).  The court also concluded that a genuine issue of material fact existed as to whether defendant CMS had a "custom or practice" of denying inmates medical care.  (*Id*. at 19).

On February 7, 2013, plaintiff moved for the appointment of counsel, which the District Court granted on October 11, 2013.  (Dkt. 64, 65).  On November 15 and 16, 2013, plaintiff filed a Rule 56(d) motion to undertake discovery, and moved for leave to file an amended complaint.  (Dkts. 66, 67).  On March 3, 2014, this court denied the Rule 56(d) motion, but granted the motion to amend.  (Dkt. 74).  Over the next year, the parties engaged in motion practice regarding discovery relevant to the issues on summary judgment.  On April 10, 2015, CMS filed a supplemental brief for summary judgment.  (Dkt. 91).  On April 28, 2015, plaintiff filed a supplemental response.  (Dkt. 92).  On May 20, 2015, the undersigned held a hearing on defendant CMS's motion.  The motion is now ready

2

for report and recommendation.

For the reasons stated herein, the undersigned recommends that defendant CMS's motion for summary judgment be **GRANTED**.

## II.    Factual Background

A.    <u>Plaintiff's medical treatment</u>

Plaintiff alleges that he injured his arm on December 12, 2006, while working in food services. (Dkt. 75).  He claims that he went directly to health services where he was seen by Nurse Janet Seets.  (Dkt. 55, Ex. A, pp. 343-44). Nurse Seets noted no objective evidence of injury, provided plaintiff with ice and ibuprofen, took plaintiff off work detail until December 18, 2006, and directed him to return to the clinic on December 14, 2006.  (*Id.*)

Plaintiff returned to the clinic for a recheck of his arm injury on December 14 and was seen by Dr. Brady.  Plaintiff reported that his arm felt better but was still painful.  Dr. Brady documented a slight indentation on plaintiff's left arm with bruising in the area of the elbow, and that plaintiff's arm was painful to touch and movement. (Dkt. 55, Ex. A., at 342).  Dr. Brady indicated a presumed diagnosis of "distal biceps rupture" and recommended a referral to an orthopedic clinic on December 15, 2006.  (*Id.* at 56). The orthopedic consultation request was denied on December 20, 2006 by the medical review officer, Dr. Keith Ivens.  (*Id.* at  55).  Dr. Ivens concluded that a surgical repair of the tendon was not medically

3

necessary and checked the box indicating "[c]riteria for service not met." (*Id.*) Dr. Brady also ordered x-rays of plaintiff's left arm. Plaintiff's arm was x-rayed on December 21, 2006, and the x-rays were normal. (Dkt. 1, ¶ 19; Dkt. 55, Ex. D).

Plaintiff returned to the clinic on December 28, 2006, for a recheck of his arm and was seen by nurse Pam Friess. (Dkt. 55, Ex. A, p. 339). Nurse Friess documented pain in plaintiff's arm, dispensed Motrin, and kept plaintiff off work detail for an additional 30 days. (*Id.*) Plaintiff returned to the clinic on January 30, 2007, and stated that his left arm was healing well and that he felt he could return to work. (*Id.* at 340).

The health clinic had no further contact with plaintiff until May 11, 2007, when plaintiff requested a copy of his medical records. (Dkt. 55, Ex. A, at 336). Plaintiff reported to the clinic on June 16, 2007, for a follow-up visit on his left arm and was seen by Dr. Anil S. Prasad. (*Id.* at 334-35). Plaintiff reported that he had little pain (only 2/20), but could not lift more than about 20 pounds without pain. (*Id.*) Dr. Prasad noted a prominent biceps muscle belly and decreased strength in plaintiff's left arm of 3/5, but that the arm was otherwise normal. (*Id.*) Dr. Prasad indicated that he would request an MRI of plaintiff's left arm to determine the extent of tear and any other pathology. (*Id.* at pp. 334-36.) Dr. DeMasi rejected Dr. Prasad's MRI request on June 20, 2007, indicating "Medical screening not met, new 407 [referral] with additional information noted below

4

needs to be sent if MP chooses to pursue," and that "[a]t this late date, how will MRI effect Rx?" (*Id.* at 331.)

Dr. Brady met with plaintiff again on July 19, 2007, and informed him of the denial of the MRI. (Dkt. 55, Ex. A, at 323). Dr. Brady indicated he would review the chart and consider the appeal process. (*Id.*) On August 1, 2007, Dr. Brady reviewed plaintiff's chart and emailed the RMO for recommendations. (*Id.* at 316.) There is nothing in the record regarding a response to Dr. Brady's email. On December 7, 2007, plaintiff kited the clinic asking for a copy of the MRI denial. (Dkt. 55, Ex. A, at 305). He kited the clinic again on February 2, 2008, requesting surgery on his left arm. (*Id.* at 303). Plaintiff continued to inquire into the status of his surgery request and requested pain medication and records regarding CMS's denial of his orthopedic consult and MRI requests on numerous occasions. (*Id.* at 293-302). On May 15, 2008, Dr. Brady reviewed plaintiff's charts regarding pain medication. (*Id.* at 288). Dr. Brady examined plaintiff on July 17, 2008, and ordered a trial of Motrin at an increased dosage. (*Id.* at 285-86). Plaintiff was seen by nurse Seets on November 26, 2008, and complained that his arm continued to be painful, especially at night. (Dkt. 55, Ex. A, at 259- 60). Nurse Seets gave plaintiff more ibuprofen and suggested an appointment with a physician. (*Id.*) Plaintiff met with Dr. Brady on December 4, 2008. (*Id.* at 251-52). Plaintiff complained of increased pain in his left arm, but

Dr. Brady noted that he did not expect such extensive pain associated with an old injury. (*Id.*)  Dr. Brady also noted that plaintiff declined x-rays but agreed to an increase in his Motrin dose. (*Id.*)

Dr. Brady next met with plaintiff on January 29, 2009, for a follow-up on plaintiff's elevated blood pressure. (Dkt. 55, Ex. A, at 234-35). At that checkup, Dr. Brady noted that plaintiff continued to question why he had not been approved for surgical repair of his ruptured biceps tendon and Dr. Brady informed him that it had been determined that such repair was not medically necessary. (*Id.*) The clinic continued to refill plaintiff's Motrin prescription. On May 2, 2009, plaintiff again requested that his request for surgery on his arm be resubmitted. (*Id.* at 217).  Dr. Brady met with plaintiff on May 14, 2009, and explained that the biceps tendon repair was not an option because it "should be done acutely." (*Id.* at 213). Plaintiff was released from custody on April 8, 2011.

> B.   Plaintiff's grievances

Plaintiff filed three grievances during his incarceration.  The first two grievances were filed in 2000 and 2001, long before plaintiff's left arm injury on December 12, 2006, and thus are not material to this dispute.  Plaintiff filed grievance ATF-08-4-004480-12d3 on April 2, 2008, complaining that defendants CMS and Dr. Brady violated the Eighth Amendment by failing to provide him with an MRI and obtain a surgical consult for his left arm. (Dkt. 55, Ex. D).  That

Step I grievance was denied on April 29, 2008.  (*Id*).

MDOC explained that CMS determined that the orthopedic consultation and MRI requests were not medically necessary, and that surgical repair of plaintiff's arm injury was not medically indicated.  (*Id*).  Plaintiff filed a Step II grievance on April 30, 2008, which was denied on May 23, 2008.  (*Id*).  A Step III grievance was filed on June 2, 2008, and denied on August 5, 2008.  (*Id*).

## III.   Defendant CMS's Motion

The central inquiry before the court is whether CMS had a policy or custom of denying inmates access to outside medical services, and if so, whether the injury claimed by plaintiff was incurred because of such a policy or custom.

Defendant CMS argues in its motion that plaintiff's claim fails for three primary reasons: (1) the extensive process by which CMS evaluated its requests for outside services, coupled with the other safeguards in place, refutes the allegations that it employed a policy or custom designed to deny such requests; (2) plaintiff's experience alone is insufficient to make a threshold showing of a clear and persistent pattern of mistreatment of detainees at the Gus Harrison Correctional Facility; and (3) even assuming the existence of such a custom or policy, plaintiff cannot establish a causal link between that policy or custom and plaintiff's alleged harm.  (Dkt. 91, Def's Br. at 2).

A.   <u>CMS has an extensive process to evaluate requests for outside services</u>

CMS alleges that the sworn testimony of three former CMS employees, and the former Medical Service Provider (MSP) for CMS confirms that CMS did not have any policies or customs of denying access for outside medical evaluation or care.  (Dkt. 91, Def.'s Br. at 10-14).  All four individuals testified that such authorization requests for outside services were the norm, not the exception, and they all denied having knowledge of any such policies or customs.  (*Id*.)

The process of authorization included a utilization management ("UM") nurse looking to no less than three resources to achieve authorization–two of which were software programs (InterQual and/or Milliman & Robertson) widely used within the healthcare industry to assist with making clinical health care decisions.  Former UM nurse, Jane May, testified that if it looked "close" upon initial screening, CMS erred on the side of authorization versus non-authorization.  (*Id*. at 11-12; citing Ex. A, May Dep. 59:13-22).  If the UM nurse was unable to authorize the request, the medical director made an independent decision based upon his knowledge and experience, including those resources used by the UM nurses.  (*Id*.)  Defendant indicated that CMS authorized on average 90 percent of all requests for outside services "on the first pass."  (*Id*.; citing Hutchinson Dep., 17:8-12).

8

CMS also indicated that there were additional safeguards in place in the authorization process. First, the MDOC operating procedure allowed for an appeals process of a non-authorization, and provided for the regular involvement of the MDOC regional medical officer, and the MDOC chief medical officer. (*Id*.; citing Ex. B, MDOC Operating Procedure & Ex. C, Hutchinson Dep. 56:8-16, 56:21-25). Second, CMS had no financial incentive to not authorize inmates from getting outside care because it was paid on a "cost-plus" basis. (*Id*. at 12). In other words, CMS was reimbursed for any offsite services rendered and then paid an additional management fee–an arrangement that incentivized CMS to authorize these requests. (*Id*. at 12-13; citing Ex. C, Hutchinson Dep. 46:15-22).

CMS also contends that the use of Form 408 which uses the language "criteria for service not met" does not establish the existence of a policy or custom designed to deny outside medical treatment. (Dkt. 91, Def.'s Mot. at 13). The testimony of Dr. Hutchinson and nurse May confirms that the word "criteria" was used in reference to widely-accepted clinical "criteria" that are used in developing evidence based medical decisions, particularly in the initial screenings performed by the UM nurses. (*Id*.) As already mentioned, CMS used the computer programs InterQual and Milliman & Robertson that presented the user with clinical "criterion" which were then compared against the information provided on the 407 referral form. Dr. Ivens further testified that he used "criteria" from his personal

9

medical knowledge and experience, or other medical resources that would be

helpful.[2]   (*Id*. at 13-14; citing Ex. D, Ivens Dep. 43:23-44:4).

> B.   <u>There is no evidence of a clear and persistent pattern of mistreatment at the facility</u>

CMS argues that plaintiff has presented no evidence of the "existence of a

clear and persistent pattern of mistreatment of detainees" at the facility, or a tacit

approval thereof, which is fatal to his claim.  (Dkt. 91, Def.'s Mot. at 16).  CMS

claims that plaintiff merely cites to cases where claims were made against CMS,

but a close reading of those cases reveals that CMS was not a party in *Dunham v.*

*Malik, et al.,* 13-10001 (E.D. Mich. Jan. 1, 2013), and that no determination on the

merits was made in *Owens v. Corr. Med. Servs. Inc.,* 07-934 (W.D. Mich. July 23,

2009).  (*Id*. at 16-17).  As such, neither of these cases can support a "clear and

persistent pattern of mistreatment" necessary for plaintiff to made a threshold

showing of a clear and persistent pattern of mistreatment of detainees.  (*Id*. at 17).

> C.   <u>Even assuming the existence of a policy or custom, plaintiff cannot establish a causal link between the policy or custom and the alleged harm</u>.

CMS argues that because non-surgical management of a rupture of the distal

---

[2]   Defendant points out that in a limited number of cases, CMS and the chief medical officer for MDOC were required to generate their own "criteria" for medical conditions that were "fairly frequent but unique to the corrections environment."  (Def.'s Mot. at 14 n.73; citing Ex. C, Hutchinson Dep. 41:9-14).  As explained by Dr. Hutchinson, however, these medical "criteria" were generated out of necessity, where commercial resources and the medical literature did not address a particular condition.  (*Id*. at 9:11-23.)

biceps tendon is an accepted course of medical treatment, there is no causal relationship between plaintiff's claimed injury and the alleged existence of any policy or custom designed to deny outside services.  (Dkt. 91, Def.'s Mot. at 17).

Assuming Dr. Brady's diagnosis to be accurate, non-surgical intervention was an accepted course of treatment.  *See* American Academy of Orthopaedic Surgeons et al., ESSENTIALS OF MUSCULOSKELETAL CARE 279-80 (Letha Yurko Griffin, M.D., Ph.D., 3d ed. 2005). The text, ESSENTIALS OF MUSCULOSKELETAL CARE, notes that although "most patients with complete ruptures do better with surgical care," "[n]onsurgical management is used with older patients who are sedentary and do not require normal elbow flexor strength and endurance." (*Id*.) Additionally, the text provides that non-surgical treatment is also appropriate for the non-dominant arm in some patients. (*Id*.)  CMS argues that consistent with this medical literature, nurse May testified that when presented with Form 407, the request for an outside orthopaedic consult "probably did not meet the criteria." (*Id*.; citing Ex. A, May Dep. 41:3-11, 41:21-42-3). May further testified that based on her experience, "[m]ost orthopaedic surgeons don't like to do a repair on a biceps tendon tear on someone over 50," even if the individual is still "active." (*Id*.)  Plaintiff was 50 years old when he sustained his injury to his non-dominant, left arm.  CMS contends that non-surgical management was an accepted course of treatment for the injury sustained.  Accordingly, says CMS, the alleged existence

11

of a policy or custom was not the "moving force" behind the non-authorization of the request for an outside consultation, and without this causal link, plaintiff is unable to establish an element of his claim.

## IV.    Plaintiff's Response

Plaintiff argues that defendant has not established that there is no issue of material fact, drawing all reasonable inferences in favor of plaintiff, that defendant did not have a policy or custom that violated plaintiff's Eighth's Amendment rights.

### A.    CMS had a policy or practice of denying outside review

Plaintiff first argues that there is contrary record evidence to show that CMS has a policy or practice of denying outside review for distal biceps ruptures.  (Dkt. 92, Pl.'s Mot. at 8-14).  Plaintiff argues that the first two resources that the UM nurses used to review a request for outside consultation were computer programs that provided objective criteria, wherein a nurse would input certain information about the injury that the detainee sustained and the program would authorize the request if certain criteria were met.  (*Id*.; citing Dkt. 91-1, May Dep. Pg. ID 898, 901-02, 911-12).  Moreover, plaintiff argues that a third resource, The Merck Manual, is also "fairly objective" in that if certain criteria are met, the request is authorized.  (*Id*.; Pg. ID 912).   Plaintiff contends that this objective criteria that leads to automatic approvals for some injuries, can reasonably be considered a

policy or practice regarding what injuries to approve for an outside consultation. (*Id*. at 9).

Plaintiff also contends that there is evidence that contradicts nurse May's testimony that CMS authorized any requests that "looked close" upon initial screening.  (*Id*. at 9).  For example, Dr. Hutchinson testified that CMS would generally not authorize requests that were in the "gray area." (*Id*.; citing Ex. 1, Hutchinson Dep. at 45, 46, 50) ("if there was a judgment call to be made it pretty much went to the doctor.")

Next, CMS attempts to narrow the scope of the policy or practice at issue by arguing that the policy should be the policy of denying prisoner's requests for outside treatment that had a distal biceps rupture, not the requests for outside referrals generally.  (Pl.'s Mot. at 10).  On this point, plaintiff alleges that Dr. Brady testified that in 2006 there was a change in the procedure regarding whether CMS would authorize the surgical repair of a distal biceps rupture.  (*Id*. at 10; citing Dkt. 91-5, Brady Dep. Pg. ID 964, 978).  Prior to 2006, CMS was approving outside referrals for this procedure, however, Dr. Ivens informed Dr. Brady in 2006 that it was "no longer a medical necessity" for distal biceps ruptures to be repaired.  (*Id*., Pg. ID 974, 980).  Plaintiff contends that this testimony is consistent with CMS's treatment history of distal biceps ruptures.  In 2005, CMS reported only one distal biceps rupture, which was referred for outside

13

consultation.  (Def.'s Supp. Disc. Resp. Ex. 3).  However, both plaintiff's request

and one more request for an outside consultation made during 2006 were not

authorized.  (*Id*.)  Moreover, plaintiff contends that nurse May's testimony

conflicts with Dr. Hutchinson's testimony regarding the frequency of distal biceps

ruptures.  Dr. Hutchinson also testified that he was "99 percent sure that a distal

biceps rupture was not on a pass-through list for automatic authorization because

"[i]t's not the type of service that would have made it onto such a list because of

the extraordinarily low volume."  (Dkt. 91, Pg. ID 879).  Nurse May testified that

distal biceps ruptures occurred "fairly frequently, quite honestly, . . ."  (R. 91-1, Pg.

ID 911).  And, when an injury is on the "pass-through" list, it can be automatically

approved without review by an UM doctor.

Plaintiff also contends that MDOC's appeals process is not evidence that

CMS did not have an unconstitutional policy or practice.  (Dkt. 92, Pl.'s Mot. at

12-13).  First, plaintiff argues that an appeals process in itself does not ensure that

CMS does not have an unconstitutional policy in the first instance.  (*Id*.)  Second,

the appeal procedures all require the MSP to initiate the appeal.  (Dkt. 91-2,

MDOC Operating Procedure, Pg. ID 915-17, Ex. 1, Hutchinson Dep. at 26, Dkt.

91-5, Brady Dep. Pg. ID 974).  Plaintiff argues that the MSP, an independent

contractor of CMS, could participate in the policy or practice of CMS by deciding

to not file an appeal that he knows will be denied because of their policy or

14

procedure. Plaintiff argues this is what happened in the current case when Dr. Brady made an informal telephone call to Dr. Ivens, and upon learning that distal biceps ruptures were not referred for outside consultation, he did not pursue the matter further.

Lastly, plaintiff argues that even if CMS did not have a financial reason for instituting an unconstitutional policy or practice, there were other reasons why CMS could have maintained an unconstitutional policy or practice including the fact that taking prisoners off-site was a security hazard, or that there was not political support for doing things that were marginal or frivolous. (Dkt. 92, Pl.'s Mot. Hutchinson Dep. at 45-46).

### B. CMS had a clear and consistent pattern of mistreatment toward other inmates at the facility

Plaintiff contends that he is alleging an unconstitutional policy that affects inmates at all CMS facilities, not just the Gus Harrison Correctional facility. (Pl.'s Mot., at 16). Plaintiff argues that CMS had a clear and consistent pattern of mistreatment and that CMS's policy on its face was deliberately indifferent to a prisoner's medical needs. (*Id*. at 17, citing *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978)). Plaintiff argues that he can support his position with the testimony of nurse May, who indicated that the request for an outside consult for a distal biceps rupture was "fairly frequent" when she worked as a UM nurse. (Dkt.

15

91-1, May Dep. Pg ID 911). Nurse May worked for many facilities, and therefore would have knowledge of requests made throughout the State of Michigan. (*Id*. at 899). Dr. Hutchinson's testimony to the contrary can be reconciled with nurse May's testimony as had the injury been on the "pass through" list, Dr. Hutchinson would never have been consulted for such injuries as they would have been automatically approved by the nurse.

Additionally, plaintiff argues that Dr. Brady's testimony that Dr. Ivens informed him that CMS had changed its approach to distal biceps ruptures supports the conclusion that CMS changed its policy from approval to non-approval. (Dkt. 91-5, Pg ID 974, 978). Dr. Ivens was the UM doctor for all MDOC facilities, and therefore Dr. Ivens' statements can be taken to mean that the policy change was reflected throughout all Michigan facilities. (Dkt. 91-4, Pg ID 941). Finally, Dr. Hutchinson testified that CMS had a policy of denying requests for outside consultation that were in the gray area. Putting all of this together, plaintiff argues that a reasonable jury could find that CMS changed its policy from automatic authorization to automatic non-authorization for requests for outside consultations for distal biceps ruptures in 2006.

C.    There is a causal link between CMS's policy and plaintiff's injury

Plaintiff contends that a jury could find a reasonable connection between his injury and CMS's policy or practice of denying outside referrals for distal biceps

16

ruptures.  (Pl.'s Mot. at 19-24).   Plaintiff had a distal biceps rupture.  Dr. Brady

called Dr. Ivens, who confirmed that CMS's procedure toward distal biceps

ruptures had changed, and that, as a result, plaintiff was not authorized for an

outside referral.  (*Id*.; citing Dkt. 91-5, Pg. ID 974).   Therefore, says plaintiff, the

policy or practice of CMS led to the non-authorization of access to an outside

consultation for plaintiff, the alleged cause of his injury.

       Defendants argue that pursuing a course of non-surgical treatment prohibits

plaintiff from establishing a causal connection between his injury and any alleged

policy because "non-surgical" intervention is considered an acceptable mode of

treatment.  Plaintiff nevertheless argues that a jury can still find that defendants'

"non-surgical" course of treatment caused plaintiff's injury.  (Pl.'s Mot. at 20).

First, plaintiff says that THE ESSENTIALS OF MUSCULOSKELETAL CARE indicates

that "most patients with complete ruptures do better with surgical repair of the

tendon."  (*Id*. at 21; citing Pg. ID 1019).  Dr. Ivens, while unable to say for certain,

testified that plaintiff's symptoms "seem[] consistent with a complete rupture."

(Dkt. 91-4, Pg. ID 948).  Plaintiff contends that defendants' argument that non-

surgical options may be considered for older patients (including plaintiff) is

misplaced because the THE ESSENTIALS OF MUSCULOSKELETAL CARE does not

define who is an "older patient."  (Pl.'s Mot. at 22, Pg. ID 1019).  Also, plaintiff

says that defendants' argument regarding the non-surgical option is not applicable

here because plaintiff was not "sedentary and ... [he] require[d] normal elbow flexor strength and endurance." (*Id.*)  Plaintiff indicates that he injured his arm while lifting "40 pounds of chow hall trays" while working in food services.  (Dkt. 91-5, Pg. ID 967, 1022).  In addition, since his release, plaintiff has sought employment (cutting firewood), but because he is incapable of heavy lifting, he has been unable to secure employment.  (Pl.'s Mot. at 22, Ex. 4 at p. 11).  Plaintiff also argues that according to THE ESSENTIALS OF MUSCULOSKELETAL CARE, if non-surgical treatment fails, "surgical care is indicated."  Therefore, according to plaintiff, his medical treatment should have included surgical care.

Plaintiff additionally argues that nurse May's opinion on accepted medical treatment for distal biceps ruptures should not be considered because she is not an expert in orthopaedics and has no training or expertise in orthopaedic surgery. (Pl.'s Mot. at 23).

**V.    Analysis**

A.    <u>Standard of Review</u>

Summary judgment is appropriately rendered "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Redding v. St. Edward*, 241 F.3d 530, 532 (6th Cir. 2001).  The standard for

determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one- sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Furthermore, the evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the movant establishes the lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (6th Cir. 2004). In order to fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, mere allegations or denials in the non-movant's pleadings will not

19

satisfy this burden, nor will a mere scintilla of evidence supporting the
non-moving party.  *Anderson*, 477 U.S. at 248, 251.

     B.    <u>Legal Analysis</u>

     As noted previously, on January 24, 1013, the undersigned recommended
that defendants' motion for summary judgment be granted in part and denied in
part.  (Dkt. 61).  Specifically, the undersigned concluded that plaintiff raised a
genuine issue of material fact as to whether plaintiff had established a "serious
medical need."  (*Id*. at 23).  With respect to liability, however, the court concluded
that plaintiff was unable to raise a genuine issue of material fact that defendant Dr.
Darrelle Brady was deliberately indifferent to his serious medical needs.  (*Id*. at
24).  Regarding defendant CMS, the undersigned concluded that "it is a reasonable
inference that CMS denied the requested medical care pursuant to a 'custom or
practice' – '[c]riteria for service not met' – and that execution of that practice
amounted to the denial of medical care in deliberate indifference to plaintiff's
injury."  (*Id*. at 19).  As such, the court recommended that defendants' motion for
summary judgment as to CMS's liability be denied.  (*Id*.)  Following a period of
discovery, CMS now moves for summary judgment arguing that it did not
maintain a policy or custom of delaying or denying inmates access to offsite
medical care.  (Dkt. 91).

     It is well-established that "[a] defendant cannot be held liable under section

1983 on a respondeat superior or vicarious liability basis." *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 818 (6th Cir. 1996), citing *Monnell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). A plaintiff who sues a private or public corporation for constitutional violations under 42 U.S.C. § 1983 must establish that a policy or custom caused the alleged injury. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998); *Street*, 102 F.3d at 818. The Sixth Circuit has held that like a municipal corporation, "[CMS's] liability must also be premised on some policy that caused a deprivation of [a prisoner's] Eighth Amendment rights." *Starcher v. Corr. Med. Sys.*, *Inc.*, 7 Fed. Appx. 459, 465 (6th Cir. 2001). Thus, in order to state a § 1983 claim against defendant CMS, plaintiff "must allege the existence of a policy, practice or custom that resulted in the injury." *Moreno v. Metropolitan Gen. Hosp.*, 2000 WL 353537, at *2 (6th Cir. 2000). Specifically, plaintiff must identify the policy, connect the policy to the defendant, and show that the execution of that policy caused the particular constitutional injury alleged. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 363- 64 (6th Cir. 1993); *see also Savoie v. Martin*, 673 F.3d 488, 493-94 (6th Cir. 2012) (plaintiff is required to plead and prove his constitutional rights were violated as a result of a policy or custom of the employer, which was the moving force behind the deprivation of rights). "It is not enough for a complaint under § 1983 to contain mere conclusory allegations of unconstitutional conduct by persons acting under color of state law.

21

Some factual basis for such claims must be set forth in the pleadings." *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986).

Liability may be premised on the existence of an express policy adopted by the appropriate authorities, or on the existence of a custom. *See Hamer v. Cnty. of Kent*, 2013 WL 8479414, at *2 (W.D. Mich. Nov. 6, 2013), *adopted by* 2014 WL 1276563 (W.D. Mich. Mar. 27, 2014). Or, liability may be premised on a failure to institute a policy or the failure to train its employees. (*Id.*) However, liability exists under this theory only where the need to act is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the policy makers can reasonably be said to have been deliberately indifferent to the need. *Id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989)). To state a claim under a theory of "inaction," plaintiff must establish (1) the existence of a clear and persistent pattern of constitutional violation by employees, (2) notice or constructive notice on the part of the employer, (3) the employer's tacit approval of the unconstitutional conduct, and (4) that the failure to act was the "moving force" or direct causal link in the constitutional deprivation. *City of Canton*, 489 U.S. at 388-89; *see also Garretson v. City of Madison Heights*, 407 F.3d 789, 796 (6th Cir. 2005).

The District Court has held that to maintain a claim against CMS, a plaintiff must identify "official policies, the actions of officials with final decision making

authority, a policy of inadequate training or supervision, or a custom of acquiescence of federal violations." *Colwell v. Corizon Healthcare, Inc.*, No. 11-15586, 2014 WL 66867464, at *9 (E.D. Mich. Nov. 26, 2014). In *Colwell*, the District Court explained that the illegal policies or customs must lead to violation of a constitutional or statutory right in the case currently pending before the court. (*Id.*) Moreover, as noted by the Sixth Circuit: before reaching the issue of whether the municipality was deliberately indifferent," the "plaintiff must demonstrate a constitutional violation at the hands of an agent or employee of the municipality." *Fox v. DeSoto*, 489 F.3d 227, 238 (6th Cir. 2007); *see also  Gray v. City of Detroit*, 399 F.3d 612, 617 (6th Cir. 2005) (finding that municipal liability "must rest on a direct causal connection between the policies or customs of the [local government entity] and the constitutional injury to the plaintiff").

As in *Colwell*, Thompson has failed to establish that any of Corizon's employees violated his constitutional rights. The undersigned previously determined that Dr. Brady was not deliberately indifferent to plaintiff's medical needs. (Dkt. 61, at 26-27). As such, the court recommended granting defendants' motion as to Dr. Brady. (*Id.*) The District Court affirmed this recommendation. (Dkt. 79).

Indeed, plaintiff acknowledges and the record confirms that he received treatment while in custody. Where plaintiff cannot prove that there was an Eighth

Amendment violation by medical treaters, there is no basis of claiming that the treater's employer, here CMS, had an unconstitutional policy. *See Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983."), citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L. Ed. 2d 806 (1986); *see also Meier v. Cnty. of Presque Isle*, 2009 WL 1285849, at *3 (E.D. Mich. 2009) (collecting cases holding that there is no municipal liability if the conduct of the individual defendants does not violate plaintiff's constitutional rights), *aff'd*, 376 Fed. Appx. 524 (6th Cir. 2010). Absent a constitutional violation by a subordinate, plaintiff cannot establish that CMS violated his constitutional rights.

The court notes that there is a narrow exception where a municipality may be liable under § 1983 even when a governmental actor is exonerated because the municipal liability is based on the actions of individuals other than those who are named as parties. *See Ford v. Grand Traverse Cty.*, 2006 WL 3613292, at *3 (W.D. Mich. Dec. 11, 2006) (citing *Bowman v. Correctional Corp. of Am.*, 350 F.3d 537, 545 (6th Cir. 2003)). In *Ford*, the District Court noted situations where "the combined actions of multiple officials or employees may give rise to a constitutional violation, supporting municipal liability, but where no one individual's actions are sufficient to establish personal liability." (*Id*. at 3). In

24

*Ford*, a plaintiff alleged that defendants violated her constitutional rights in that they were deliberately indifferent to her serious medical needs. The case proceeded to trial, and the jury returned a special verdict, finding the defendant County was deliberately indifferent to the medical needs of plaintiff through its policy or custom regarding weekend medical care and that the policy was a proximate cause of plaintiff's injury. The jury further concluded that none of the individual corrections officers were deliberately indifferent to plaintiff's serious medical needs. The defendant County subsequently filed a motion for judgment as a matter of law on the ground that a municipality cannot be held liable under § 1983 unless a constitutional violation by its agents is first established. The District Court denied the County's motion because defendant failed to advance its arguments regarding municipal liability in the pre-verdict motion.  Moreover, defendant submitted the special verdict form used by the jury in resolving liability. The form allowed for a verdict against the County, regardless of the findings made as to the individual defendants.  In *Bowman*, while acknowledging that such a situation could exist, the Sixth Circuit determined that the case before it did not present a situation sufficient to establish municipal liability.  The *Bowman* court went on to conclude that even if a policy is unconstitutional, there must be a violation of an individual's constitutional rights for municipal liability to be imposed.  *Ford*, 2006 WL at *3 (citing *Bowman*, 350 F.3d at 545).

25

Because there were genuine issues of material fact regarding whether CMS's policy of denying authorizations for distal biceps ruptures that led to a violation of plaintiff's Eighth Amendment rights, this court denied defendant CMS's initial motion for summary judgment and ordered that discovery be taken on the issue of whether CMS had a 'custom or practice' of denying inmates medical care." (Dkt. 61 at 19).

Following a period of discovery in this case, this court concludes that Thompson has failed to establish a genuine issue of material fact that CMS had a policy or custom of non-authorization of requests for outside consultations of distal biceps ruptures that led to a violation of his Eighth Amendment rights.

CMS outlined its policy for authorizing referrals for outside medical consultation, which was supported by the testimony of the deposition witnesses. The referral process was initiated by a medical service provider (hereinafter "MSP"), a physician assistant, or a nurse practitioner, all of whom provided services to the general inmate population. (Dkt. 91, Ex. C, Hutchinson Dep. 6:20-24). Upon receipt from CMS, Dr. Hutchinson indicated that the "clerical staff entered [the] request into a computer database to record its arrival and then to track its progress to a decision." (*Id*. at 8:1-9:1). The referral was then assigned to a utilization management (hereinafter UM) nurse who looked to three resources in an attempt to authorize an outside consultation for a particular injury. (*Id*.) The

first step included the UM nurse inputting a diagnoses code into a software program called InterQual. (Dkt. 91, May Dep., at 7:3-16). If there were an appropriate number of matches between the clinical criteria and the inmate's symptoms, an authorization number was generated, signaling the authorization of the request. (*Id.* at 7:18-8:1). If an authorization could not be made using InterQual, the UM would consult a second computer software program, Milliman & Robertson, which provided the UM with additional clinical criteria that were screened against Form 407. (*Id.*, at 31:1-8). Similar to InterQual, if enough matches were generated with Milliman & Robertson, approval was given and an authorization number was generated. (*Id.* At 8:4-11; 24:5-12). Finally, if the clinical criteria could not be met using the computer software programs, the UM could consult The Merck Manual in an attempt to authorize an outside referral. (*Id.*, at 8:11-13).

If the UM nurse was not able to authorize the request, it was forwarded to the Medical Director for additional review. (Dkt. 91, May Dep. 40:24-41; 43:18-44:2). Ultimately, the Medical Director had same access to information as the UM nurse, including to the inmate's electronic record found in SERAPIS. (*Id.*, at 15: 19-25; 32:21-24; 44:7-11). Dr. Ivens testified that together with the information available, Medical Directors drew upon their own knowledge and experience, and consulted other resources–including medical textbooks or other physicians, as

27

necessary–when rendering opinions on whether to authorize a referral for outside consultation. (Dkt. 91, Ivens Dep., 14:16-20, 15:71-25). The Medical Director's decision was then placed on the 408 Form and sent back to the onsite facility to be placed in the inmate's medical record. (Dkt. 91, Hutchinson Dep., 16:11-12). In the event of a non-authorization, the decision could be appealed. (Dkt. 91, Ex. B, MDOC Operating Procedures).

Importantly, during all times relevant to this litigation, CMS has handled between 1,500 and 2,000 referrals for outside services for the MDOC. (Dkt. 91, Hutchinson Dep. 17:8-12). During that time, CMS averaged a 90-percent authorization rate on the first-pass, which did not account for authorizations subsequently approved on appeal. (*Id*.) Further, both nurse May and Dr. Hutchinson testified that CMS erred on the side of authorization. Ms. May testified that, "if it looked close," the UM nurses authorized the outside referral. (Dkt. 91, May Dep. 59:13-21). Likewise, Dr. Hutchinson testified that: "[CMS] expected us to use these industry standard tools and our medical judgment and if something was medical[ly] necessary, to authorize it." (Dkt. 91, Hutchinson Dep. 59:11-16). The MDOC procedure also allowed for appeals for non-authorization and provided for the involvement of the MDOC regional and chief medical officer, beyond the initial appeal made by the medical service provider. (Dkt. 91, Ex. B & Ex. C at 56:8-16, 56:21-25).

In the context of medical care, a prisoner's Eighth Amendment right to be free from cruel and unusual punishment is violated only when the prisoner can demonstrate a "deliberate indifference" to his serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-06 (1976).[3]  "Where a prisoner has received some medical attention and the dispute is over the adequacy of treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) (citations omitted).  Moreover, mere negligence in identifying or treating a medical need does not rise to the level of a valid mistreatment claim under the Eighth Amendment. *Estelle*, 429 U.S. at 106.

A viable Eighth Amendment claim has two components, one objective and

---

[3]  Plaintiff's counsel argued at the hearing that plaintiff did not believe that the issue of deliberate indifference was within the scope of the court's discovery order, or the present motion; however, nothing in the court's discovery directives limited plaintiff in taking discovery on determining whether CMS's actions met the deliberate indifference standard.  Indeed, on August 29, 2014, the undersigned entered a text order setting a discovery deadline of January 30, 2015.  On January 12, 2015, the undersigned entered a stipulated order to extend discovery by 30 days, or until March 1, 2015.  (Dkt. 83).  On February 22, 2015, the undersigned entered a second, stipulated order to extend discovery only for the purpose of taking the depositions of Dr. Ivens and Dr. Hutchinson, and for the parties to file their supplemental briefs.  (Dkt. 88).   The court never imposed any limits on plaintiff's ability during the discovery period to demonstrate that defendants acted with deliberate indifference.  The court finds significant that all of plaintiff's witness were questioned about the injury at issue and how that injury was handled by CMS.  Importantly, all of plaintiff's witnesses were questioned about the standard medical textbook, The Essentials of Musculoskeletal Care, and the witnesses testified about their experiences regarding the frequency of treating distal biceps tendons, the treatment of distal biceps tendons, and the treatment that occurred in this case.  Plaintiff, did in fact take discovery on the issue of deliberate indifference, however, his evidence is simply insufficient.   The court concludes that plaintiff's *ex post facto* argument to obtain additional evidence on the issue of whether CMS was deliberately indifferent to be unavailing.

the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2002). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Farmer*, 511 U.S. at 834. Courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson*, 503 U.S. at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9. The undersigned concluded in defendants' original motion for summary judgment that plaintiff had raised a genuine issue of material fact as to whether he has established a "serious medical need." (Dkt. 61, at 23).

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *Farmer*, 511 U.S. at 834. To

establish the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded the risk." *Id.* at 837. In other words, this prong is satisfied when a prison official acts with criminal recklessness, i.e., when he or she "consciously disregard[s] a substantial risk of serious harm." *Brooks v. Celeste*, 39 F.3d 125, 128 (6th Cir. 1994) (citing *Farmer*, 511 U.S. at 839-40). "Basically, there must be a knowing failure or refusal to provide urgently needed medical care which causes a residual injury that could have been prevented with timely attention." *Lewis v. Corr. Med. Servs.*, 2009 WL 799249, at *2 (E.D. Mich. Mar. 24, 2009).

In cases where an inmate alleges deliberate indifference but the record demonstrates that the inmate received medical attention and is, in essence, filing suit because he disagrees with certain treatment decisions made by the medical staff, the plaintiff fails to state a claim under the Eighth Amendment. *See McFarland v. Austin*, 196 Fed. Appx. 410, 411 (6th Cir. 2006) ("as the record reveals that McFarland has received some medical attention and McFarland's claims involve a mere difference of opinion between him and medical personnel regarding his treatment, McFarland does not state a claim under the Eighth Amendment"); *White v. Corr. Med. Servs., Inc.*, 94 Fed. Appx. 262, 264 (6th Cir.

2004) (affirming dismissal of the complaint for failure to state a claim where the essence of plaintiff's claims was that he disagreed with the defendants' approaches to his medical treatment where defendant discontinued plaintiff's previous course of treatment and prescribed what plaintiff considered to be less effective treatment); *Catanzaro v. Michigan Dep't of Corr.*, 2010 WL 1657872, at *3 (E.D. Mich. Feb. 28, 2010) (plaintiff failed to state a claim of deliberate indifference when "he specifically alleges that he was given medications that proved ineffective to relieve his symptoms, rather than medications that he believed were more effective, such as Drixoral, Sudafed and Deconamine"), *adopted by* 2010 WL 1657690 (E.D. Mich. Apr. 22, 2010); *Allison v. Martin*, 2009 WL 2885088, at *7 (E.D. Mich. Sept. 2, 2009) (plaintiff failed to state a claim of deliberate indifference in violation of the Eighth Amendment when the complaint reveals plaintiff was seen over a dozen times for his eczema and was given medication, though not the "type" and quantity he requested).  Thus, "[w]hen a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a constitutional violation." *Comstock*, 273 F.3d at 703.

  The court previously determined that "plaintiff was diagnosed with a ruptured biceps tendon and that he received some minimal medical care for his

32

injury–he was examined by the medical staff and received ice, pain medication, []
an x-ray[, and was taken off work detail].  However, he was denied any diagnostic
testing in the form of an MRI and denied a referral to an orthopedic specialist for
further assessment of his injury and possible surgery." (Dkt. 61, at 22).  During
the discovery phase allowed by the court, Dr. Hutchinson testified that whether a
particular service was medically necessary (here, surgical intervention) was based
on a variety of factors, including: utilizing the computer-based programs available
including InterQual and Milliman & Robertson, reviewing medical resources (e.g.,
THE ESSENTIALS OF MUSKULOSKELETAL CARE), accessing the Internet, or relying
on a physician's knowledge and experience.  (Dkt. 91, Ex. C 28:1-14).  In sum, Dr.
Hutchinson testified that his job was to "make a good medical decision" based on
the resources available to him.  (*Id*.)  Specifically, the text relied upon by both
parties in this case, THE ESSENTIALS OF MUSKULOSKELETAL CARE, from the
American Academy of Orthopaedic Surgeons, indicates that the "[r]upture of the
distal biceps brachii tendon is uncommon, accounting for less than 5% of biceps
tendon ruptures[.]" (Dkt. 91, Ex. G, at 7).  The text goes on to note that while
"[m]ost patients with complete ruptures do better with surgical repair" of the
tendon, "[n]onsurgical management is used with older patients who are sedentary
and do not require normal elbow flexor strength and endurance."  (*Id*. at 8).
Moreover, "[n]onsurgical treatment may also be appropriate for the nondominant

33

arm in selected patients and in cases of delayed diagnosis." (*Id.*) The court notes that nowhere in the text does it indicate that surgery is mandated for such an injury. Moreover, plaintiff injured his non-dominant left arm, indicating the appropriateness of nonsurgical intervention. Given the above, the undersigned concludes that nonsurgical intervention was a viable treatment option for plaintiff.

The law is clear where a prisoner is provided with treatment, the fact that he is not provided with the best possible treatment does not make the course selected, unacceptable or unconstitutional. Plaintiff has not shown that CMS was deliberately indifferent to his medical needs by selecting a treatment option that was within the approved range.

## VI.   RECOMMENDATION

For the reasons stated herein, the undersigned recommends that defendant CMS's motion for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: June 12, 2015                                       s/Michael Hluchaniuk
                                                          Michael Hluchaniuk
                                                          United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 12, 2015, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

<u>s/Tammy Hallwood</u>
Case Manager
(810) 341-7887
tammy_hallwood@mied.uscourts.gov
